UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
DOROTHY FIGUROWSKI,

MEMORANDUM & ORDER

                     Plaintiff,       14-CV-7032(JS)(AKT)

      -against-

MARBIL INVESTORS, LLC, WILLIAM J.
CHRISTIE, and EMMETT CHRISTIE,

                   Defendants.
---------------------------------------X
ROGER FIGUROWSKI,

                     Plaintiff,       14-CV-7034(JS)(AKT)[1]

      -against-

MARBIL INVESTORS, LLC, WILLIAM J.
CHRISTIE, EMMETT CHRISTIE, and BARBARA
LIEB, as Aider and Abettor,

                   Defendants.
---------------------------------------X

APPEARANCES
For Plaintiffs:
Dorothy Figurowski  Amrita Ashok-Khan, Esq.
                 Joseph A. Myers, Esq.
                 Patricia Lynne Boland, Esq.
                 Neil Frank, Esq.
                 Neil Frank and Associates
                 500 Bicounty Boulevard, Suite 465
                 Farmingdale, NY 11735

---

[1] Roger Figurowski ("Roger") and Dorothy Figurowski ("Dorothy," and together with Roger, "Plaintiffs") initially filed separate actions, but on May 18, 2017, the Court consolidated the cases under Docket Number 14-CV-7032 and marked Docket Number 14-CV-7034 closed. (May 18, 2017 Elec. Consol. Order.) Unless otherwise indicated, all docket entries referenced herein refer to the consolidated action, Docket Number 14-CV-7032.

```
Roger Figurowski      Amrita Ashok-Khan, Esq.
                      Joseph A. Myers, Esq.
                      Patricia Lynne Boland, Esq.
                      Neil Frank, Esq.
                      Neil Frank and Associates
                      500 Bicounty Boulevard, Suite 465
                      Farmingdale, NY 11735

                      Lauren R. Reznick, Esq.
                      Leeds Brown Law, PC
                      1 Old Country Road, Suite 347
                      Carle Place, NY 11514

For Defendants:       Andrew E. Curto, Esq.
                      Frank W. Brennan, Esq.
                      Gregory S. Lisi, Esq.
                      Forchelli, Curto, Deegan,Schwartz, Mineo &
                      Terrana, LLP
                      333 Earle Ovington Blvd., Suite 1010
                      Uniondale, NY 11553
```

SEYBERT, District Judge:

      Pending before the Court are (1) Defendants Marbil Investors, LLC ("Marbil"), William J. Christie ("William"), and Emmett Christie's ("Emmett," and collectively, "Defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (Defs.' Dorothy Mot., Docket Entry 54), and (2) Defendants and Barbara Lieb's ("Lieb") motion for summary judgment, (Defs.' Roger Mot., Docket Entry 73).

      For the following reasons, Defendants' motion on Dorothy's claims is GRANTED IN PART and DENIED IN PART, and Defendants' motion on Roger's claims is GRANTED IN PART and DENIED IN PART.

I.   Factual History

     A.   Greenbrier Hires Roger

          In 1980, Marbil acquired the Greenbrier Luxury Garden Apartments ("Greenbrier"), a two-story, eighty-one-unit residential property in Patchogue, New York. (Defs.' Dorothy 56.1 Stmt. ¶¶ 23-24; Dorothy's Am. Compl., Docket Entry 26, ¶ 13.) Marbil retained Robert Thek ("Thek") of Robert Thek & Associates ("RTA") to serve as Greenbrier's property manager. (Defs.' Dorothy 56.1 Stmt. ¶ 25.)  In that capacity, Thek was responsible for hiring, firing, recommending salaries and salary increases, and recommending benefits and benefit changes for all Greenbrier employees. (Defs.' Dorothy 56.1 Stmt. ¶¶ 26-27.)

          In 1992, after responding to a newspaper ad for a superintendent position, Roger met with Thek. (Defs.' Dorothy 56.1 Stmt. ¶¶ 28-29.) As a result of the meeting, RTA hired Roger to serve as a trial superintendent at the Country Club Gardens,

---

[2] The following facts are taken from the parties' Local Civil Rule 56.1 Statements and Counterstatements.  Any relevant factual disputes are noted.  Internal quotation marks and citations have been omitted.  Citations are as follows: Defendants' 56.1 Statement in support of their motion against Dorothy (Defs.' Dorothy 56.1 Stmt., Docket Entry 59); Dorothy's 56.1 Counterstatement (Dorothy's 56.1 Counterstmt., Docket Entry 48-2); Defendants' 56.1 Statement in support of their motion against Roger (Defs.' Roger 56.1 Stmt., Docket Entry 77); and Roger's 56.1 Counterstatement (Roger's 56.1 Counterstmt., Docket No. 14-CV-7034, Entry 37-2).

which was not associated with Defendants.  (Defs.' Dorothy 56.1 Stmt. ¶ 30.)

Subsequently, in March 1992, Defendants hired Roger as the sole, live-in superintendent for Greenbrier.  (Defs.' Dorothy 56.1 Stmt. ¶ 32.)  His duties included performing building maintenance, supervising three to four workers, checking and showing apartments, calling potential tenants, collecting wage statements from potential tenants, collecting rent, assisting in tenant evictions, and addressing problems as they arose.  (Defs.' Dorothy 56.1 Stmt. ¶ 33; Defs.' Roger 56.1 Stmt. ¶ 18.)  During his deposition, Roger testified that he was hired to perform building maintenance, check and show apartments, collect rent, and supervise workers, and that he performed those duties from 1992 through 2014.  (Roger Dep., Brennan Decl. Ex. 2, Docket Entry 56-2, 132:12-24, 139:20-140:16.)  Plaintiffs dispute that at the time of his hire, Roger was responsible for collecting rent, calling potential tenants, collecting and reviewing wage statements from potential tenants, or assisting with tenant evictions.[3]  (Roger's 56.1 Counterstmt. ¶ 17.)

---

[3] Other than testimony from Roger's wife, Dorothy, that Roger did not initially collect rent from tenants, (Dorothy Dep., Brennan Decl. Ex. 3, Docket Entry 56-3, 58:21-59:18), the cited testimony does not clearly contradict Roger's deposition testimony.  For instance, Dorothy testified that Roger was hired to do maintenance work, but that Thek also discussed "apartment rentals" with Plaintiffs.  (Dorothy Dep. 56:23-58:20.)  Further, when asked if Roger was responsible for renting or showing

As payment for his duties, Roger received an annual wage and was permitted to reside with Dorothy and their four children, rent free, in Greenbrier apartment 311-2. (Defs.' Dorothy 56.1 Stmt. ¶¶ 34-35.)

B.   Dorothy's Relationship with Greenbrier

The parties dispute whether Dorothy performed work for Greenbrier and Defendants. Roger testified that in 1992, only he was offered a position with Greenbrier and only he received pay from Greenbrier. (Roger Dep. 20:12-17.) Similarly, Dorothy testified that when Roger was hired, she did not discuss with William, a partner at Marbil, or Emmett, the overseer of superintendents at Marbil, (William Dep., Brennan Decl. Ex. 1, Docket Entry 56-1, 4:17-22), whether she was being hired to perform work at Greenbrier. (Dorothy Dep. 56:8-17). She testified that she was not performing work at that time, but that the work "came on as the years went by." (Dorothy Dep. 56:15-17.) Additionally, she acknowledged that in 1992, Thek did not tell her that she would be a clerical worker or rental agent or that she would receive pay. (Dorothy Dep. 58:5-9, 94:2-6.)

However, Dorothy also testified that after Roger was hired, she met with Thek, who explained that Roger was responsible

---

apartments, Dorothy explained, "You know what, I don't really recall the exact wording details. It's such [ ] a long time ago." (Dorothy Dep. 56:23-58:20.)

for maintenance, but also discussed apartment rentals and suggested that she "help out" and "show a little bit." (Dorothy Dep. 57:11-58:9.) Similarly, she testified that she was expected to help Roger show the apartments and "had work to do in the beginning." (Dorothy Dep. 92:5-93:25.)

Additionally, Dorothy testified that for the last ten years, Thek told her that she "need[ed] to get paid." (Dorothy Dep. 94:2-18.) Roger also testified that six or seven years after his hire, Thek spoke to Dorothy about "trying to get her . . . paid for what she[ ] does, because she did answer all the phone calls, did all the E-mails and stuff like that." (Roger Dep. 21:7-13.) Roger, however, acknowledged that those duties were initially assigned to and were never taken from him, (Roger Dep. 21:14-22:6), and Dorothy agreed that Roger was hired to perform those tasks, (Dorothy Dep. 104:15-24).

### 1. Bankruptcy Filings

A number of other events shed light on the nature of Dorothy's relationship with Greenbrier and Defendants. For instance, in 2009, Roger and Dorothy filed for bankruptcy in the U.S. Bankruptcy Court for the Eastern District of New York. (Defs.' Dorothy 56.1 Stmt. ¶ 39.) In support of their filing, they completed and filed with the bankruptcy court a document entitled "Schedule I - Current Income of Individual Debtor(s)," on which they listed Dorothy's occupation as a "Homemaker" with no

6

income.  (Defs.' Dorothy 56.1 Stmt. ¶ 40; Schedule I, Brennan Decl. Ex. 5, Docket Entry 56-5, at ECF p. 2-3.)  Additionally, Dorothy executed and presented to the bankruptcy court an "Affidavit of Income" testifying that she was a "homemaker."[4]  (Defs.' Dorothy 56.1 Stmt. ¶ 41; Aff. of Income, Brennan Decl. Ex. 5, Docket Entry 56-5, at ECF p. 4.)

### 2.  May 2012 Letter to Defendants

Additionally, on or about May 14, 2012, Dorothy sent a letter to William to complain that, among other things, she and Roger had not been properly compensated and reimbursed for "expenses," including overtime compensation, unused vacation time, cell phones used for work, and commissions for renting apartments. (Defs.' Dorothy 56.1 Stmt. ¶ 42; Dorothy Dep. 134:4-13.)  Dorothy testified that there was never an agreement that Defendants would reimburse her for these "expenses," (Dorothy Dep. 134:4-22), but she added that Thek told her many times over the years that he would pay her, or would tell William and Emmett to pay her, for her work at Greenbrier, (Dorothy Dep. 135:22-137:9).  However, Dorothy was not paid as a result of the May 2012 letter.  (See Defs.' Dorothy 56.1 Stmt. ¶¶ 42-43.)

---

[4] Plaintiffs purport to dispute these facts, alleging that "[a] Bankruptcy Court employee instructed [Dorothy] to identify as a 'homemaker,' since she derived no income from the services which she provided to Defendant, and was unable to provide proof of income due to the Defendants' failure to provide her with wage statements."  (Dorothy's 56.1 Counterstmt. ¶¶ 40-41.)

### 3. August 2012 Commission Agreement with Thek

In or about August 2012, Dorothy and Thek agreed that Dorothy would be paid a $200 commission for each apartment she helped rent. (Defs.' Dorothy 56.1 Stmt. ¶ 44; Dorothy's 56.1 Counterstmt. ¶ 44; Dorothy Dep. 130:22-131:16.) Dorothy testified that Thek "want[ed]" William and Emmett to pay her, but that he never said that they agreed to the arrangement. (Dorothy Dep. 130:22-132:11.) Dorothy initially helped rent four (4) apartments and received a commission of $800, (Defs.' Dorothy 56.1 Stmt. ¶ 46), but in all, from about August 28, 2012 to June 25, 2013, Thek paid Dorothy $2,400 in commissions for the rental of twelve (12) apartments at Greenbrier, (Defs.' Dorothy 56.1 Stmt. ¶ 49).

Dorothy testified that Emmett "put a stop to" these payments because "whatever was given to [her] was supposed to be discussed between" Thek and Emmett, and the two had not discussed the arrangement. (Dorothy Dep. 132:25-133:19.) She testified further that on or about August 12, 2013, Emmett informed her that "it has been brought to [our] attention that Bob Thek . . . has been paying a $200 bonus for any apartment rented at Greenbrier and that $800 total has been made out to you in the last month's statement, which was unauthorized. This arrangement has never been discussed by anyone from this office and will cease immediately." (Dorothy Dep. 224:21-225:12.)

Plaintiffs aver that Emmett was aware of Dorothy's arrangement with Thek and of Thek's "promise to pay [Dorothy] for the work that she did for" Greenbrier, citing her testimony that she spoke to Emmett about being paid in "probably 2012 [or] 2013" and that Emmett responded that they could discuss the matter another time. (Dorothy's 56.1 Counterstmt. ¶ 50; Dorothy Dep. 96:15-97:11.) Additionally, Plaintiffs highlight a letter from William to Thek dated April 25, 2013 referencing Dorothy's commissions, which provides that the expenditure has "never been authorized or discussed with Emmett or me and, therefore, [it is] strictly unauthorized." (Apr. 2013 Letter, Myers Decl. Ex. 20, Docket Entry 64-20.)

### 4. Emmett's Other Communications with Dorothy

Plaintiffs also aver that Emmett "had full knowledge that [Dorothy] was working for [Greenbrier], and would often provide her with work assignments." (Dorothy's 56.1 Counterstmt. ¶ 50.) In support, Plaintiffs point to Dorothy's testimony that Emmett asked for updates about her work, (Dorothy Dep. 108:13-109:2), as well as work-related emails from Emmett to Dorothy or to "Roger/Dorothy" (Dorothy's 56.1 Counterstmt. ¶ 50; June 2011 Email, Myers Decl. Ex. 15, Docket Entry 64-15, at ECF p.2). For instance, on June 30, 2011, Emmett wrote: "Roger/Dorothy: With the vacancy count being high at Greenbrier, please continue to work these leads I am sending you." (June 2011 Email, at ECF p.2; see

<u>also</u> Nov. 2013 Email, Myers Decl. Ex. 16, Docket Entry 64-16, at ECF p. 4 ("Dorothy please forward me the 6 leases that you have there[.] I need them since we now have all of the leases in house. [T]hanks. Emmett.").)

C. <u>The Boiler Replacement Project</u>

In or about 2013, Defendants replaced the boilers at Greenbrier.[5] (Defs.' Roger 56.1 Stmt. ¶ 22.) Defendants aver that Roger worked on the boilers despite being told not to do so, while Plaintiffs claim that Roger worked on them at the urging of the boiler technician, Mike. (Defs.' Roger 56.1 Stmt. ¶¶ 23-24; Roger's 56.1 Counterstmt. ¶¶ 23-24.) In any event, Roger testified that a worker whom he supervised, Jose, installed circulator pumps on the boilers, that Roger did not know in which direction they were supposed to be installed, and that one of the pumps was installed backwards under Roger's supervision. (Roger Dep. 113:5-114:24.)

William testified that Roger was told "not to touch" the new boiler system. (William Dep. 22:10-13.) Additionally, Roger testified that "they"--presumably, Defendants--told him not to touch the boilers, but that Mike told him that "the supers are

---

[5] While Plaintiffs do not dispute the statement that Defendants undertook this project in or about 2013, (Roger's 56.1 Counterstmt. ¶ 22), they cite an email from October 2011 regarding boilers, (Roger's 56.1 Counterstmt. ¶ 23). In light of this email, it seems that Defendants may have replaced Greenbrier's boilers earlier than 2013.

supposed to do the circulator" pumps, so Roger asked him for guidance.[6]  (Roger Dep. 112:19-113:4.)  According to Roger, Mike ultimately "made a few comments" criticizing Roger's work on the circulator pumps.  (Roger Dep. 117:2-18.)

D.  Apartment 311-3

In or about March 2013, Thek directed Roger to renovate the bathroom of and rent out apartment 311-3, the unit next to Plaintiffs' apartment.  (Defs.' Roger 56.1 Stmt. ¶ 26.)  In or about August 2013, after completing the renovation, Roger cut a hole through the wall of his and Dorothy's apartment so that they could access and occupy apartment 311-3, though the parties dispute the circumstances surrounding this action.  (Defs.' Dorothy 56.1 Stmt. ¶ 51; Dorothy's 56.1 Counterstmt. ¶ 51.)  Roger testified that without Emmett's or William's permission, he took over the apartment while Thek was no longer at Greenbrier.  (Roger Dep. 98:15-99:8.)  Dorothy, however, testified that Plaintiffs did not initially want to move into the apartment or cut a hole in the wall, but that Thek told them to do so and said that if they did not cut through the wall, he would.  (Dorothy Dep. 158:7-24, 174:2-21.)  Defendants aver that Thek instructed Plaintiffs to cut

---

[6] Plaintiffs also highlight the fact that Dorothy sent an email to Emmett on October 29, 2011, explaining that Roger was having issues with the new boilers and asking for help because he did not want to be blamed for any problems that might occur.  (Oct. 2011 Email, Myers Decl. Ex. 13, Docket Entry 79-13.)

through their wall because of his diminished mental capacity, citing Roger's testimony that in Thek's last two years at Greenbrier, he was weakening "mostly physically" and that his mental capacity was "getting there, but not that bad." (Defs.' Dorothy 56.1 Stmt. ¶ 51; Roger Dep. 98:4-14.)

To power apartment 311-3, Plaintiffs ran an extension cord to the basement and tapped into the building's common power supply; however, the parties dispute whether this was authorized. (Defs.' Dorothy 56.1 Stmt. ¶ 52; Dorothy's 56.1 Counterstmt. ¶ 52.) Dorothy testified that rather than have the power company turn on the power to apartment 311-3, Plaintiffs told Thek that they would run a cord to the basement, and he consented. (Dorothy Dep. 161:12-162:8.) Roger testified that he ran the wire to draw power from the basement because he "didn't want to make any kind of [electric] bills there." (Roger Dep. 44:24-46:13.)

Around December 2013, Thek was terminated as Greenbrier's property manager, (Defs.' Dorothy 56.1 Stmt. ¶ 53; Dorothy's 56.1 Counterstmt. ¶ 53), because, as William testified, his "health was deteriorating [and] [w]e thought he wasn't of good sound mental mind. There were poor decisions being made. And things being overlooked. And certain things that were between him and Roger that I wasn't happy with." (William Dep. 20:4-11).

Marbil replaced Thek[7] with Lieb of Vea Las Vistas, Inc. (Defs.'
Dorothy 56.1 Stmt. ¶ 54.)

During a property inspection, Lieb discovered that
Plaintiffs had cut through the wall of apartment 311-2, ran an
extension cord to the basement of the building, and tapped into
the building's power supply to occupy apartment 311-3. (Defs.'
Dorothy 56.1 Stmt. ¶ 55.) She directed Plaintiffs to vacate
apartment 311-3, fix the hole, and remove the wiring. (Defs.'
Dorothy 56.1 Stmt. ¶ 56.) Plaintiffs obliged, and very soon
thereafter, apartment 311-3 was rented for $1,099 per month.
(Defs.' Dorothy 56.1 Stmt. ¶ 57.) In all, Plaintiffs occupied
apartment 311-3 from August 2013 through January 2014 without
paying rent and without paying for any utilities that they used.[8]
(Defs.' Dorothy 56.1 Stmt. ¶ 58.)

On January 27, 2014, Defendants advised Roger that the
unauthorized occupancy and wiring of apartment 311-3 were illegal
and extremely dangerous to the tenants of the building, and they
put Roger on notice that, "based on these serious infractions,"

---

[7] Thek is now deceased. (William Dep. 8:2-5.)

[8] Plaintiffs dispute this statement, but the evidence they cite
in no way contradicts it. (See Dorothy's 56.1 Counterstmt. ¶ 58
(citing Dorothy Dep. 173:8-12 (testifying that Emmett had not
agreed to Plaintiffs' occupancy and that he instructed them to
close the hole, which they did).)

Defendants would evaluate his employment status. (Defs.' Dorothy 56.1 Stmt. ¶ 59; Dorothy Dep. 265:19-266:8.)

Lieb also discovered that Plaintiffs had been occupying areas in the basement of the apartment building as a storage and laundry area without paying rent for their use, (Defs.' Dorothy 56.1 Stmt. ¶ 60), which Plaintiffs also claim was authorized by Thek, (Dorothy's 56.1 Counterstmt. ¶ 60; Dorothy Dep. 83:16-84:18). Additionally, Plaintiffs occupied another room for their children to use as an exercise space and did not pay rent for it. (Defs.' Dorothy 56.1 Stmt. ¶ 61.)

E.  <u>Defendants Fire Roger</u>

On May 2, 2014, Defendants advised Roger, who Plaintiffs aver was 69 years old at the time, (Roger's Opp., Docket Entry 78, at 6), that they were terminating his employment. (Defs.' Dorothy 56.1 Stmt. ¶ 62.) Defendants allowed Plaintiffs to occupy apartment 311-2 through June 17, 2014, but directed Roger to turn in all of his keys to the Greenbrier complex. (Defs.' Dorothy 56.1 Stmt. ¶ 62.) Defendants advised Roger that they would pay him severance pay of four weeks' salary in two installments. (Defs.' Dorothy 56.1 Stmt. ¶ 62.) They paid him the first installment of $1,065.52 on May 2, 2014, and said they would pay him the second installment when Plaintiffs vacated the apartment on June 17, 2014. (Defs.' Dorothy 56.1 Stmt. ¶¶ 62, 65.)

After his termination, Roger returned his keys and Defendants secured the Greenbrier complex, including by having its new, younger, (Roger's Opp. at 13-14), superintendent, James Bagger ("Bagger"), lock the door to the basement storage room that Plaintiffs had been using. (Defs.' Dorothy 56.1 Stmt. ¶¶ 63-64; Defs.' Roger 56.1 Stmt. ¶ 50.) Thereafter, Plaintiffs requested that Defendants provide them access to the basement storage room so that they could remove their belongings, and Defendants granted them access. (Defs.' Dorothy 56.1 Stmt. ¶ 66.) Dorothy testified that the door was locked on May 2, 2014, and that it would be "locked off and on according to when [they] needed it." (Dorothy Dep. 210:6-211:11.)

F.  Plaintiffs Notify Defendants of Their Claims

On June 2, 2014, Plaintiffs' counsel wrote to Defendants and informed them for the first time that Plaintiffs intended to pursue them for age discrimination and wage and hour violations. (Defs.' Dorothy 56.1 Stmt. ¶ 70.)

Plaintiffs claim that before Defendants were notified of this lawsuit, Dorothy was "freely permitted" to "coordinate with" Bagger to retrieve her belongings from the basement area, but that after their letter, Emmett had to approve all requests to enter the space, which restricted their access to the room. (Dorothy's 56.1 Counterstmt. ¶ 69.) Plaintiffs claim that Dorothy was required to "repeatedly ask the new superintendent" and Lieb to

open the door, and that she was forced to email Defendants to obtain her belongings. (Dorothy's 56.1 Counterstmt. ¶ 69.) Dorothy also testified that Bagger told her that he could not unlock the space, and that she had to call Greenbrier. (Dorothy Dep. 211:22-212:8.) Roger testified that after sending the letter, Plaintiffs were granted supervised access to the basement storage area on several occasions to remove the remainder of his family's belongings. (Roger Dep. 157:18-24.) However, Plaintiffs claim that they were given only two hours to do so. (Roger's 56.1 Counterstmt. ¶ 47.)

On or about June 17, 2014, Plaintiffs and their children vacated apartment 311-2 and took the apartment's refrigerator and stove. (Defs.' Dorothy 56.1 Stmt. ¶ 71; Roger Dep. 162:5-8.) Plaintiffs claim that they replaced the original appliances with their own, and that the refrigerator and stove were "not fixtures in the apartment and were not the property of the Defendant." (Dorothy's 56.1 Counterstmt. ¶ 71.)

After Plaintiffs vacated the apartment, Defendants did not pay Roger the second half of his severance pay. (William Dep. 11:12-12:5.) When asked if he knew why Roger was not paid the second installment, William testified "I guess he retained counsel to sue us. It wasn't part of the arrangement that was fair." (William Dep. 11:18-21.)

## II. Procedural History

### A. Dorothy's Action

Dorothy filed her Complaint on December 3, 2014. (Dorothy's Compl., Docket Entry 1.) On March 26, 2015, Dorothy filed an Amended Complaint, (See Dorothy's Am. Compl.), which Defendants answered on April 9, 2015, (Ans. to Dorothy's Am. Compl., Docket Entry 27).

Dorothy's Amended Complaint alleges that Defendants: failed to pay Dorothy minimum wage and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; failed to pay her minimum wage in violation of the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190 et seq. & 650 et seq.; failed to pay her overtime wages in violation of the NYLL; violated the notice and record-keeping requirements of NYLL Section 195; retaliated against her for complaining about her unpaid wages in violation of NYLL Section 215; and failed to compensate her for her efforts, under a quantum meruit theory of liability. (Dorothy's Am. Compl. ¶¶ 38-60.) Dorothy seeks unpaid overtime and minimum wages, pre- and post-judgment interest, liquidated damages, a declaratory judgment, actual damages for loss of income and employment-related benefits, compensatory damages for emotional distress and mental anguish, front pay, attorneys' fees and costs, and statutory damages. (Dorothy's Am. Compl. at 8-9.)

On April 24, 2017, Defendants filed their motion for summary judgment against Dorothy, (Defs.' Dorothy Br., Docket Entry 58), and Dorothy opposed the motion on April 24, 2017, (Dorothy Opp., Docket Entry 63). Defendants filed their reply on May 8, 2017. (Defs.' Dorothy Reply, Docket Entry 66.)

B. <u>Roger's Action</u>

Roger filed his Complaint against Defendants and Lieb on December 3, 2014, alleging claims for, among other things, unpaid overtime wages under the FLSA and NYLL and unpaid spread-of-hours pay under the NYLL. (Roger's Compl., Docket No. 14-CV-7034, Entry 1, ¶¶ 58-70.) On February 9, 2015, Defendants and Lieb filed a motion to dismiss Roger's overtime and spread-of-hours claims under the NYLL, retaliation and aiding and abetting claims under the New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 296 <u>et</u> <u>seq.</u>, and breach of contract claim. (Defs.' Feb. 2015 Mot. to Dismiss, Docket No. 14-CV-7034, Entry 13.) Defendants answered Roger's Complaint on February 9, 2015. (Ans. to Roger's Compl., Docket No. 14-CV-7034, Entry 18.)

On July 1, 2015, this Court granted Defendants and Lieb's motion in part and dismissed with prejudice Roger's overtime and spread-of-hours pay claims under the NYLL. (July 2015 Mem. & Order, Docket No. 14-CV-7034, Entry 25, at 11.) Additionally, the Court <u>sua</u> <u>sponte</u> dismissed without prejudice Roger's age discrimination, retaliation, aiding and abetting, and breach of

contract claims for lack of subject matter jurisdiction. (July 2015 Mem. & Order, at 11.)

On August 5, 2015, Roger filed an Amended Complaint alleging that Defendants: failed to pay him overtime wages in violation of the FLSA; violated NYLL Section 195's notice and record-keeping requirements; fired him because of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and the NYSHRL; retaliated against him for his complaints of age discrimination in violation of the ADEA and the NYSHRL; aided and abetted age discrimination in violation of NYSHRL; and breached a contract by failing to pay the balance of his severance pay. (Roger's Am. Compl., Docket No. 14-CV-7034, Entry 27, ¶¶ 59-86.) Roger seeks unpaid overtime wages, liquidated damages, pre- and post-judgment interest, a declaratory judgment, actual damages for loss of income and employment-related benefits, compensatory damages for emotional distress and mental anguish, front pay, attorneys' fees and costs, and statutory damages. (Roger's Am. Compl. at 11-12.) Defendants and Lieb answered Roger's Amended Complaint on August 14, 2015. (Ans. to Roger's Am. Compl., Docket No. 14-CV-7034, Entry 28.)

On March 20, 2017, this Court so ordered the parties' stipulation of dismissal with respect to Roger's FLSA overtime claim and NYLL Section 195 claim. (Mar. 2017 Order, Docket No. 14-CV-7034, Entry 45.)

Defendants filed their motion for summary judgment against Roger on March 24, 2017 (Defs.' Roger Br., Docket Entry 76.) Roger opposed the motion on April 24, 2017, (Roger's Opp.), and Defendants filed their reply brief on May 8, 2017, (Defs.' Roger Reply, Docket No. 14-CV-7034, Entry 59).

C. Consolidation

On March 18, 2015, Roger's and Dorothy's actions were consolidated for the purposes of discovery. (Mar. 18, 2015 Stip. & Order, Docket Entry 25.) On May 18, 2017, the Court consolidated Roger's and Dorothy's suits. (May 18, 2017 Elec. Consol. Order.)

## DISCUSSION

In Dorothy's opposition, she indicated that she does not oppose Defendants' motion with respect to her overtime claims. (Dorothy's Opp., Docket Entry 63, at 1 n.1.) Accordingly, Dorothy's overtime claims are DISMISSED WITH PREJUDICE. Thus, Dorothy's remaining claims are for minimum wages under the FLSA and the NYLL; violations of the NYLL's notice and record-keeping requirements; retaliation under the NYLL; and quantum meruit.

Similarly, in his opposition, Roger noted that he does not oppose the motion to the extent that it seeks summary judgment on his aiding and abetting claim against Lieb. (Roger's Opp. at 1 n.1.) Accordingly, the aiding and abetting claim against Lieb is DISMISSED WITH PREJUDICE. Because there are no remaining claims against Lieb, the Clerk of the Court is directed to TERMINATE her

as a defendant.  Thus, Roger's remaining claims are for age discrimination in violation of the ADEA and the NYSHRL ("Roger's Age Discrimination Claims"); retaliation in violation of the ADEA and the NYSHRL ("Roger's Retaliation Claims"); and breach of contract.

## I.  Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at

*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II. Dorothy's FLSA Claim

Defendants argue that Dorothy's minimum wage claim fails because she was a volunteer, not an "employee."  (Defs.' Dorothy Br. at 17-20.)  In response, Dorothy contends that she was an "employee" under the FLSA because she sought compensation and Defendants "suffered and permitted" her to work.  (Dorothy's Opp. at 6-9.)

With some exceptions, "the FLSA requires employers to pay all employees a specified minimum wage."  Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 533 (2d Cir. 2016) (citing 29 U.S.C. §§ 206-07).  The FLSA "appl[ies] only to employees," which the "FLSA unhelpfully defines . . . as an 'individual employed by an employer.'"  Id. at 534 (quoting 29 U.S.C. § 203(e)(1)).  Under the FLSA, "'[e]mploy' includes to suffer or permit to work."  29 U.S.C. 203(g).  The term "employee"

22

has been construed broadly, see Brown v. New York City Dep't of Educ., 755 F.3d 154, 161 (2d Cir. 2014), as evidenced by several regulations identified by Plaintiffs.[9] (See Dorothy's Opp. at 6.) However, while the FLSA's coverage is broad, the Supreme Court has explained that "[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." Walling v. Portland Terminal Co., 330 U.S. 148, 152, 67 S. Ct. 639, 641, 91 L. Ed. 809 (1947).

In Walling, the Supreme Court held that unpaid railroad brakemen trainees were not employees entitled to minimum wages under the FLSA. Walling, 330 U.S. at 152-53, 67 S. Ct. at 641, 91 L. Ed. 809. As summarized by the Second Circuit in Glatt, the Supreme Court "adduced several facts" in reaching its decision: (1) "the brakemen-trainees at issue did not displace any regular employees, and their work did not expedite the employer's business," (2) "the brakemen-trainees did not expect to receive any compensation and would not necessarily be hired upon successful completion of the course," (3) "the training course was similar to

---

[9] Dorothy cites 29 U.S.C. § 785.11 ("Work not requested but suffered or permitted is work time.") and 29 U.S.C. § 785.13 ("In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them.").

one offered by a vocational school," and (4) "the employer received no immediate advantage from the work done by the trainees." Glatt, 811 F.3d at 534 (citing Walling, 330 U.S. at 149-50, 152-53, 67 S. Ct. at 640-42, 91 L. Ed. 809). In Glatt, the Second Circuit ultimately developed a "primary beneficiary test," a set of non-exhaustive factors to help courts determine whether an intern is an employee under the FLSA. Id. at 536-37 (citing Velez v. Sanchez, 693 F.3d 308, 330 (2d Cir. 2012), and Brock v. Superior Care, Inc., 840 F.2d 1054, 1058–59 (2d Cir. 1988), and noting that similar factor tests have been developed in the domestic worker and independent contractor contexts). The Second Circuit noted that the "touchstone of this analysis is the 'economic reality' of the relationship." Id. at 537 (quoting Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008)). "[E]conomic realities are assessed by reference to 'the particular situation' with some factors more important than others depending on the FLSA question at issue and the context in which it arises." Brown, 755 F.3d at 167-68 (quoting 29 C.F.R. § 553.106) (outlining various Second Circuit economic realities tests). Weighing the economic realities is a question of fact, while "the legal conclusion to be drawn from those facts--whether workers are employees . . . --is a question of law. Brock, 840 F.2d at 1059.

Dorothy argues that she was an "employee" covered by the FLSA, (Dorothy's Opp. at 6-8), while Defendants contend that she

was merely an individual who, without any expectation or promise of compensation, performed activities assigned to and carried on by Roger, (Defs.' Dorothy Br. at 17-20). The facts before the Court do not fit squarely within the Second Circuit's existing factor tests.[10] Nonetheless, in light of <u>Glatt</u> and <u>Walling</u> and considering the totality of the circumstances, the Court weighs whether the economic realities establish that Dorothy was Defendants' employee or simply a volunteer helping her husband perform his job. See <u>Brown</u>, 755 F.3d at 170 ("No single economic realities test, however, applies to all FLSA questions. Rather, a court must identify, from the totality of circumstances, the economic (and other) factors most relevant to the issue in dispute.").

Viewing the facts in the light most favorable to Dorothy, the Court concludes that she was not Defendants' employee. Defendants hired one worker, Roger, to perform a number of tasks, such as maintaining Greenbrier and showing and renting apartments. (Roger Dep. 132:12-24.) He performed those duties from 1992 to 2014, (Roger Dep. 139:20-140:16), and he was never relieved of his responsibilities, (Roger Dep. 21:14-22:6). Dorothy cites no

---

[10] Additionally, while the Second Circuit recently examined an analogous "statutory exception to the FLSA for public agency volunteers, [it] express[ed] no view on FLSA issues . . . . respecting purported private sector volunteers." <u>Brown</u>, 755 F.3d at 161 n.3.

evidence that she ever applied for a job, submitted a resume, or was hired by Defendants. In 2009, she identified herself as a homemaker in sworn filings with the Bankruptcy Court. From the outset, it appears that Dorothy helped Roger fulfill the duties that Defendants hired him to perform; she did not provide Defendants with a benefit in exchange for compensation. To be sure, she sent emails on Roger's behalf, (see, e.g., Oct. 2011 Emails, Myers Decl. Ex. 16, Docket Entry 64-16, at ECF p. 3), and there is no doubt that Roger benefitted when Dorothy shouldered some of his workload. However, Defendants received no additional benefit simply because Dorothy, rather than her husband, performed those tasks. See Emanuel v. Rolling in the Dough, Inc., No. 10-CV-2270, 2012 WL 5878385, at *5 (N.D. Ill. Nov. 21, 2012) ("As a matter of economic reality, if [plaintiff] and [her boyfriend] were doing the same job and sharing duties[,] it stands to reason that they would also share the salary of [the position]."). Additionally, as Roger and Dorothy were replaced by only one employee--Bagger--Dorothy did not displace any employees or confer any additional, immediate advantage on Defendants. See Glatt, 811 F.3d at 534, 537 (citing Walling, 330 U.S. at 149-50, 153, 67 S. Ct. at 642, 91 L. Ed. 809).

While Defendants suggested that Dorothy help Roger with his job and sent emails to "Roger/Dorothy" or sometimes to "Dorothy," Defendants never promised to pay her and "rebuffed" her

requests for payment during her many years at Greenbrier. (Dorothy's Opp. at 7; Dorothy Dep. 56:11-17, 58:5-9, 134:4-22, 224:21-225:12.) Thus, she could not have expected to receive compensation for her efforts. See Glatt, 811 F.3d at 534, 536-37 (citing Walling, 330 U.S. at 150, 67 S. Ct. at 640, 91 L. Ed. 809); see also Brown, 755 F.3d at 165-67 (requiring that plaintiff's expectation of compensation be "reasonable" in the context of public agency volunteer exception to FLSA). While Dorothy received "commissions" of $2,400 during approximately one of her twenty-two (22) years at Greenbrier, it was clear that Defendants did not authorize the commissions, but that Thek, and only Thek, was responsible for the arrangement. Defendants had denied Dorothy's request for a similar deal only months before and advised her that the commissions were unauthorized shortly after she began receiving them. (Defs.' Dorothy 56.1 Stmt. ¶¶ 42, 44; Dorothy's 56.1 Counterstmt. ¶ 44; Dorothy Dep. 130:22-132:11, 224:21-225:12.) That she continued her efforts even after Defendants ended her "commission" arrangement with Thek and after her other unsuccessful requests for payment supports no other conclusion than that she was helping Roger, not working for Defendants. Nor was Dorothy dependent on Defendants for compensation, as she received only a nominal sum during her time at Greenbrier. Rather, she depended on Roger, who earned a salary and accommodations for his family in exchange for his work.

In sum, under all the circumstances, the economic realities establish that Dorothy was not Defendants' employee. The primary beneficiaries of Dorothy's efforts were not Defendants, but Roger and Dorothy. Dorothy makes much of the expansive definition of "employee," but that definition does not include "each person who, without promise or expectation of compensation, but solely for [her] personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." <u>Walling</u>, 330 U.S. at 152, 67 S. Ct. at 641, 91 L. Ed. 809.

Courts facing similar facts have reached the same conclusion. For example, in <u>Sontheimer v. General Medicine, PC</u>, No. 14-CV-0417, 2015 WL 12591749, at *5 (W.D. Mich. Oct. 7, 2015), the court found that an employee's wife was not herself an "employee" by virtue of helping him perform the tasks he was hired to complete. The <u>Sontheimer</u> court's analysis fits the facts here:

> Plaintiff [(employee's wife)] had no express or implied agreement with Defendant [(husband's employer)] that she would perform services to assist her husband in exchange for wages, even assuming arguendo that Plaintiff herself "eventually wanted to be compensated." The record does not support the proposition that Defendant substantially controlled the terms and conditions of her work, claimed any authority to hire or fire her, or maintained any employment record, including a rate or method of payment. Neither does the record support the proposition that Plaintiff was an integral part of Defendant's operations. Rather, the record supports the proposition

that her activities were integral to, and
wholly dependent on, her husband's employment
with Defendant and that her activities
concluded when [her husband's] employment was
terminated. Last, the record does not support
the proposition that Plaintiff was
economically dependent on Defendant inasmuch
as Plaintiff does not dispute that she did not
apply to Defendant for paid employment but was
merely granted permission by Defendant to
accompany [her husband]. In sum, drawing all
reasonable inferences in Plaintiff's favor,
the Court agrees that the factual setting in
this case does not give rise to coverage under
the FLSA.

Sontheimer, 2015 WL 12591749, at *5 (internal citations omitted)

(alterations added). Similarly, in Emanuel, 2012 WL 5878385, at

*5, the court found that an employee's life partner was not an

employee for FLSA purposes, despite the fact that she chose to

share his duties. The court granted summary judgment to the

defendant-employer, reasoning that:

The economic reality here is that [employer]
hired [employee] to run the Elmhurst store and
[employee] supported [employee's partner] and
their children. The fact that [employee's
partner] chose to assist [employee] with his
duties after being informed that she would not
be paid and that her efforts would be of better
use elsewhere does not mean she is
economically dependent on the defendants.

Id.; cf. Okoro v. Pyramid 4 Aegis, No. 11-CV-0267, 2012 WL 1410025,

at *9 (E.D. Wis. Apr. 23, 2012) (finding that plaintiff was an

employee where both she and the defendant-employer agreed that she

would be paid for her work in the future). Additionally,

Plaintiff's argument that Defendants' knowledge of her continued

efforts to assist Roger with his duties created an employment relationship is unconvincing. See Emanuel, 2012 WL 5878385, at *4 ("Here, plaintiff . . . advances an absurd position. [Plaintiff] argues that defendant['s] repeated statement that he would not pay her to work at the Elmhurst store was not a refusal to hire her as an employee, but an offer for her to work for free. Since [plaintiff] claims to have worked at the Elmhurst store without compensation and without [defendant] forcibly ejecting her from the store or otherwise preventing her from working, it is her position that an employment relationship impliedly exists.")

Therefore, because Dorothy was not Defendants' employee,[11] Defendants' motion for summary judgment on her claim for unpaid minimum wages under the FLSA is GRANTED, and that claim is DISMISSED WITH PREJUDICE. See Sontheimer, 2015 WL 12591749, at *5-6.

## III. Dorothy's State Law Claims

In light of the dismissal of Dorothy's FLSA claim, only her state law claims for unpaid minimum wages under the NYLL, violations of the NYLL's notice and record-keeping requirements, retaliation under the NYLL, and quantum meruit remain. "'[A]bsent exceptional circumstances, where federal claims can be disposed of

---

[11] Because the Court concludes that Dorothy was not Defendants' employee, it need not reach Defendants' frivolous argument that it is not an "enterprise engaged in commerce."

pursuant to Rule 12(b)(6) or [on] summary judgment grounds, courts should abstain from exercising pendant jurisdiction.'" <u>Milton v. Valley Stream Cent. High Sch. Dist.</u>, No. 15-CV-0127, 2018 WL 1136909, at *11 (E.D.N.Y. Mar. 1, 2018) (citations omitted) (alterations in original); <u>see also Sontheimer</u>, 2015 WL 12591749, at *5-6. The Court determines that retaining jurisdiction over the remaining state law claims is unwarranted. Thus, the Court declines to exercise supplemental jurisdiction over Dorothy's remaining claims pursuant to 28 U.S.C. § 1367(c)(3), and they are DISMISSED WITHOUT PREJUDICE.

IV. <u>Roger's Age Discrimination Claims</u>

Defendants argue that Roger's Age Discrimination Claims must fail because he was unqualified for his job and cannot establish a <u>prima facie</u> case of age discrimination. (Defs.' Roger Br. at 11-15.) They further argue that they had legitimate reasons for terminating his employment and that Roger cannot show that age discrimination was the "but for" cause of his firing. (Defs.' Roger Br. at 11-15.) Roger responds that he was qualified for his position, that he has established a <u>prima facie</u> case, and that Defendants' purported non-discriminatory reasons for firing him were pretextual. (Roger's Opp. at 8-14.)

"Under the ADEA, it is unlawful for an employer to 'discriminate against any individual . . . because of such individual's age.'" <u>Boonmalert v. City of N.Y.</u>, --- F. App'x ---

-, No. 17-CV-1465, 2018 WL 496846, at *3 (2d Cir. Jan. 22, 2018) (quoting 29 U.S.C. § 623(a)(1)) (ellipsis in original). Courts evaluate ADEA and NYSHRL age discrimination claims under the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). McGuire-Welch v. House of the Good Shepherd, --- F. App'x ----, No. 16-CV-4095, 2018 WL 443487, at *1 (2d Cir. Jan. 17, 2018) (citations omitted). "Under this framework, 'the plaintiff bears the initial burden of establishing a prima facie case of discrimination,'" id. (quoting Delaney v. Bank of Am. Corp., 766 F.3d 163, 168 (2d Cir. 2014)), which he does by demonstrating "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination," Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 18-19 (2d Cir. 2013) (citing Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)). If the plaintiff can establish a prima facie case, "the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for its action.'" McGuire-Welch, 2018 WL 443487, at *1 (quoting Delaney, 766 F.3d at 168). "If the defendant proffers such a reason, 'the presumption raised by the prima facie case is rebutted and drops from the case,'" id. (quoting Kovaco v. Rockbestos-Surprenant Cable Corp.,

834 F.3d 128, 136 (2d Cir. 2016)), "and 'the plaintiff must prove that the employer's proffered reason was a pretext for discrimination,'" id. (quoting McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006)).  To show pretext under the ADEA, the plaintiff must show that his age was the "but for" cause of the adverse employment action, id. (citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)), and the Second Circuit has "assumed, without deciding, that this standard also applies to age discrimination claims under the NYSHRL," id. (citing Gorzynski, 596 F.3d at 105 n.6).

        With respect to Roger's prima facie case, Defendants do not dispute that as an individual who was fired while in his 60s and replaced by a much younger worker, Roger belonged to a protected class and suffered an adverse employment action under circumstances giving rise to an inference of discrimination. (Defs.' Roger Br. at 12-13.)  Defendants dispute only that Roger was qualified for his position, based mainly on his alleged inability to service Greenbrier's boiler system.  (Defs.' Roger Br. at 12-13.)  Roger argues that he was qualified for the position of superintendent at Greenbrier.  (Roger's Opp. at 8-9.)

        "In order to establish the qualification element of a discrimination claim, the plaintiff is only required to 'establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.'"  Jones-Khan v. Westbury

<u>Bd. of Educ.-Westbury Union Free Sch. Dist.</u>, No. 13-CV-7144, 2017
WL 1483522, at *6 (E.D.N.Y. Apr. 25, 2017) (quoting <u>Markovich v.</u>
<u>City of N.Y.</u>, No. 09-CV-5553, 2013 WL 11332465, at *5 (E.D.N.Y.
Aug. 21, 2013), <u>aff'd</u>, 588 F. App'x 76 (2d Cir. 2015)).  Given
that Defendants employed Roger for approximately twenty-two (22)
years and they only point to his inability to perform tasks related
to the boilers, a jury could find that Roger carried his minimal
burden of establishing the qualification prong of his <u>prima facie</u>
case.    Thus,  the  burden  shifts  to  Defendants  to  provide  a
legitimate, non-discriminatory reason  for  terminating  Roger's
employment.   <u>See</u> <u>McGuire-Welch</u>, 2018 WL 443487, at *1 (quoting
<u>Delaney</u>, 766 F.3d at 168).

Defendants  have  articulated  a  number  of  reasons  for
firing Roger: (1) Roger's mishandling of Greenbrier's new boilers,
including  overseeing  the  incorrect  installation  of  a  circulator
pump  and  disobeying  Defendants'  directives  to  leave  the  system
alone; (2) "the unauthorized occupancy and [(3)] illegal wiring of
apartment 311-3" that posed a hazard to the building's tenants;
(4) Defendants' subsequent discovery of Plaintiffs' unauthorized
occupation of a "basement storage area/laundry room" and (5)
another room that their children used for exercise, (Defs.' Roger
Br. at 12-14); (6) Roger's unauthorized charges on Greenbrier's
credit card, (Defs.' Roger Reply at 4); (7) Plaintiffs' removal of
the stove and refrigerator from their apartment, which the Court

acknowledges occurred after Roger was fired; and (8) the declining quality of Roger's work, (Roger's Opp. at 10). Because Defendants have proffered legitimate, non-discriminatory reasons for firing Roger, the burden shifts back to Roger to show that these reasons were pretextual. See McGuire-Welch, 2018 WL 443487, at *1 (quoting McPherson, 457 F.3d at 215 (2d Cir. 2006)).

Roger argues three points in support of his position that Defendants' reasons for terminating his employment were pretextual: (1) Defendants have provided a number of "continually shifting rationales" for firing Roger, (Roger's Opp. at 10-12); (2) their proffered reasons are "post-termination rationalizations," (Roger's Opp. at 12); and (3) Defendants used Plaintiffs' occupancy of apartment 311-3 as a pretext because they fired him months after first discovering his occupancy, (Roger's Opp. at 12-14). These arguments lack merit. Roger cannot show that Defendants' reasons, "even if pretextual, served as pretext for age discrimination." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 98 (2d Cir. 1999) (emphasis added) (citing Fisher v. Vassar Coll., 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc)).

With respect to Roger's first argument, while "'a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff,'" McGuire-Welch, 2018 WL 443487, at *2 (quoting Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir.

2001)), there is no such inconsistency here.  Citing <u>Norville</u>,
Roger argues that the Court should not reconcile an employer's
varying explanations for firing an employee.  (Roger's Opp. at 11-
12 (citing <u>Norville</u>, 196 F.3d at 98).)  However, in <u>Norville</u>, the
defendant's proffered reasons contradicted each other.  <u>Norville</u>,
196 F.3d at 98.  Here, Defendants consistently pointed to a number
of reasons that contributed to their decision to fire Roger, rather
than to several, shifting reasons that they claimed were
individually responsible for Roger's termination.  Further, there
is no contradiction among Defendants' proffered motives.  They
revolve around Roger's unauthorized occupancy of and modifications
to various areas of Greenbrier, his alleged conversion of
utilities, appliances, and expenses, and his failure to properly
handle or follow instructions regarding the boilers.  <u>See</u> <u>Roge</u>,
257 F.3d at 170 (finding no pretext where the defendant's multiple
proffered reasons for terminating the plaintiff's employment were
not inconsistent); <u>McGuire-Welch</u>, 2018 WL 443487, at *2 (finding
no inconsistency in explanations for termination where one
particular "failure was 'the final straw'").  That Defendants
recited different portions of their list of grievances, with
different levels of specificity at different times, does not change
the result, as none of the reasons casts doubt on the legitimacy
of any of the others.

Roger's second argument, that Defendants cited his unauthorized use of two additional Greenbrier rooms only after he was fired, and that "[t]he fact that these issues were only raised post-litigation strongly suggests that they are pretextual," (Roger's Opp. at 12 (citation omitted)), is similarly unconvincing. Again, these reasons are variations on Defendants' previously proffered explanations for terminating Roger's employment--his unauthorized occupation of Greenbrier rooms. Defendants' position was entirely consistent: They did not want Roger occupying an adjacent apartment, the basement, or an "exercise room" without paying rent or seeking Defendants' permission. Moreover, Defendants took issue with his use of the basement storage area prior to his termination, as they locked him out of the room on the same day he was fired. Thus, there is no doubt that these reasons are not "post-termination rationalizations" that evidence Defendants' pretext for age discrimination.

The Court finds Roger's third argument--that his termination over his use of apartment 311-3 was pretextual because Defendants discovered it in January 2014 but waited until May 2014 to fire him--to be equally unavailing. Roger argues that the first strike against him was Defendants' January 2014 discovery of his use of the apartment and that "strike two" was the wiring issue discovered later in January 2014, but that there was no third

strike against him.  According to Roger, this "suggests that now Defendants had not decided to terminate [Roger], but he was on his last legs."  (Roger's Opp. at 13-14.)  In response, Defendants highlight the third strike against Roger, their April 2014 discovery of his mishandling of the boilers.  (Defs.' Roger Reply at 4-5.)  Significantly, this sequence of events supports Defendants' position that multiple, varied reasons contributed to the decision to terminate Roger's employment.

Finally, even if any of the above circumstances abstractly suggested pretext, Roger has failed to produce any evidence that Defendants' reasons "served as pretext for <u>age discrimination</u>." <u>Norville</u>, 196 F.3d at 98 (emphasis added) (citing <u>Fisher</u>, 114 F.3d at 1339).  Roger "must ultimately establish 'both that the reason [for firing him] was false, <u>and</u> that discrimination was the real reason.'" <u>Harnack v. Health Research Inc.</u>, No. 11-CV-518S, 2013 WL 5951857, at *4 (W.D.N.Y. Nov. 6, 2013) (emphases in original) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515, 113 S. Ct. 2742, 2751, 125 L. Ed. 2d 407 (1993)).  The sole circumstance supporting Roger's Age Discrimination Claims is that he was replaced with a younger worker.  "[T]ypically 'a replacement worker's age, without more, is insufficient to prove age discrimination.'" <u>Id.</u> (quoting <u>Dieck v. Suffolk Cty. Vanderbilt Museum</u>, No. 09-CV-2263, 2011 WL 4434066, at *5 (E.D.N.Y. Sept. 22, 2011)).  The Court concludes that in this case, Roger

has failed to proffer evidence sufficient to support a finding that Defendants' legitimate, non-discriminatory reasons for firing him were pretexts for age discrimination. See id. at *6 (quoting Fagan v. N.Y. State Elec. & Gas Corp., 186 F.3d 127, 135 (2d Cir. 1999)) ("Accordingly, aside from the fact that younger employees were hired after [plaintiff] was discharged, there is no evidence of age-based discrimination. . . . [I]n this case the replacement workers' age is insufficient for a fact-finder to infer that the pretext was masking unlawful discrimination." (internal quotation marks and citations omitted)). Rather, the evidence bears one conclusion, that Defendants fired Roger for a host of contributing reasons, none of which was his age. Thus, Roger cannot show that his age was a "motivating factor" in his termination, let alone the "but for" cause of the decision. See McGuire-Welch, 2018 WL 443487, at *1 & n.1.

Accordingly, Roger's Age Discrimination Claims are DISMISSED WITH PREJUDICE.

V.    Roger's Retaliation Claims

Roger asserts that Defendants retaliated against him for complaining about the alleged age discrimination in violation of the ADEA and the NYSHRL by restricting his access to the basement storage room and refusing to pay him the second installment of his

severance.[12]  Defendants contend that he cannot succeed on his Retaliation Claims because he cannot show that he suffered a materially adverse employment action or a causal connection between a protected activity and the employment action, and, as a result, does not set forth a prima facie case of retaliation. (Defs.' Roger Br. at 15-17.)  Additionally, they argue that they had a legitimate and non-retaliatory reason for restricting his access to the basement storage area.  (Defs.' Roger Br. at 15-17.)  Roger responds that he has established a prima facie claim and that Defendants' supposed legitimate reasons for their acts of retaliation are pretextual. (Roger's Opp. at 14-19.)

"[T]he ADEA . . . [and] the NYSHRL . . . contain anti-retaliation provisions that prohibit an employer from retaliating against an employee for opposing discriminatory conduct prohibited by the statutes."  Shih v. JPMorgan Chase Bank, N.A., No. 10-CV-9020, 2013 WL 842716, at *5 (S.D.N.Y. Mar. 7, 2013) (citations omitted).  "While there are slight differences in the showing

---

[12] The Court notes that "[a] successful retaliation claim 'is not dependent on the merits of the underlying discrimination complaint.'"  Matya v. United Ref. Co., 323 F. App'x 65, 67 (2d Cir. 2009) (quoting Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986)).  Moreover, plaintiffs may pursue claims for acts of retaliation that occurred after their employment with the defendant ended.  See, e.g., Boland v. Town of Newington, 304 F. App'x 7, 9 (2d Cir. 2008) ("Accordingly, a former employee . . . can sue a former employer under ADEA on the grounds that the employer retaliated against the former employee for bringing an age discrimination claim.").

needed to make out a prima facie case for retaliation from that for discrimination," the McDonnell Douglas burden-shifting framework applies to Roger's Retaliation Claims. Ben-Levy, 518 F. App'x at 19 (citing cases). To establish his prima facie case, Roger has to demonstrate "'[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Boonmalert, 2018 WL 496846, at *3 (alterations in original); see also Shih, 2013 WL 842716, at *5 (citing cases) ("The anti-retaliation provisions in Title VII, the ADEA, the ADA, and the NYSHRL contain nearly identical language and are analyzed under the same framework."). Defendants then must "proffer a non-discriminatory reason for the challenged action, whereupon the burden shift[s] back to [Roger] to show that reason was pretextual." McGuire-Welch, 2018 WL 443487, at *3 (citing Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002)).

Defendants do not dispute that by having his attorneys send them the June 2, 2014 letter complaining of age discrimination and wage and hour violations, Roger engaged in a protected activity known to Defendants. However, they dispute that he was subjected to any adverse employment action. (Defs.' Roger Br. at 15-16.) Additionally, Defendants argue that there is no causal connection between their locking the basement storage area on May 2, 2014 and

Plaintiffs' subsequent complaint on June 2, 2014. (Defs.' Roger Br. at 16.) On the latter point, Roger agrees, (Roger's Opp. at 14), so the only remaining issues are whether Defendants' further restriction of Plaintiffs' access to the basement and Defendants' failure to pay Roger the second severance installment are adverse employment actions.

Defendants maintain that restricting Plaintiffs' access to the basement storage area after they received Plaintiffs' letter was not an adverse employment action, but a "petty slight[ ] or minor annoyance[ ]." (Defs.' Roger Br. at 16 (citation omitted).) Roger argues that after Defendants initially locked the basement storage area on May 2, 2014, he and Dorothy "could easily access the storage room where they kept personal belongings by requesting access from the on-site superintendent." (Roger's Opp. at 14.) However, after Defendants received the June 2, 2014 letter, Dorothy "was suddenly denied access by the new superintendent," was "further informed . . . that they could not access the storage room without the express permission of Defendants," and was told by Emmett that "as a result of [the letter, he] decided to lock [Roger] and his family out of the storage room." (Roger's Opp. at 15.) Roger does not contest that on multiple occasions, Defendants granted supervised access to the room to remove the family's belongings.

While Defendants dispute Roger's version of events, (Defs.' Roger Reply at 6-7), the Court must view the facts in the light most favorable to Roger.  Thus, the question for the Court is whether Roger suffered an adverse employment action when he had to seek the express permission of one of the Defendants for supervised access to the basement instead of requesting access from an on-site superintendent.[13]

"It is well-established that a plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment. Dickens v. Hudson Sheraton Corp. LLC, 689 F. App'x 670, 672 (2d Cir. 2017) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)), cert. denied, 138 S. Ct. 335, 199 L. Ed. 2d 224 (2017), reh'g denied, No. 17-5712, 2018 WL 491641 (U.S. Jan. 22, 2018).  The change in working conditions "must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Id. (quoting Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015)).  Examples of materially adverse employment actions include "'a termination of employment, a demotion evidenced by a decrease in wage or salary,

---

[13] Roger frames the retaliatory action as Defendants' "greatly restricting [his] access after June 2, 2014 . . . . [by] switching from allowing the new superintendent to provide access . . . to suddenly requiring the Defendants' express permission."  (Roger's Opp. at 18.)

a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices . . . unique to a particular situation.'" Id. (quoting Vega, 801 F.3d at 85). Significantly, while anti-retaliation provisions "do contemplate that conduct that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination' may be a materially adverse action against a worker," the reference to material adversity separates "'significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" Id. at 672-73 (alteration in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)).

That Plaintiffs had to obtain permission from Defendants to access the basement storage room instead of asking the on-site superintendent is not a materially adverse employment action. Plaintiffs acknowledge that Defendants granted them access to the room to retrieve their belongings, and the fact that their access was supervised after they sent Defendants the June 2, 2014 letter does not change the analysis. These are the types of "trivial harms" that could not have "dissuaded a reasonable worker" from making a charge of discrimination. See, e.g., El v. N.Y. State

Psychiatric Inst., No. 13-CV-6628, 2014 WL 4229964, at *7 (S.D.N.Y. Aug. 19, 2014) (holding that employer's yelling at and requiring employee to seek permission to use the washroom were petty slights or minor annoyances that did not rise to the level of materially adverse changes in employment). Defendants' restriction of Roger's access to the basement storage room does not rise to the level of a materially adverse employment action, and Roger has not stated a prima facie case of retaliation with respect to this act.

However, Roger has established a prima facie case of retaliation relating to Defendants' refusal to pay him the second half of his severance, which a jury could conclude is sufficiently material to constitute an adverse employment action. That Defendants ignore this claim in their briefing is telling, as is William's testimony on this issue:

> Q.   When [Roger] vacated, was he supposed to get money from yourself, from the company?
> A.   If I recall, I think we offered him some kind of expense money to move or whatever.
> Q.   Was that money paid?
> A.   Half.
> Q.   Do you know some reason why the other half was not paid?
> A.   I guess he retained counsel to sue us. It wasn't part of the arrangement that was fair. . . .   The first part was paid.   We weren't aware of a legal suit.
> Q.   And then you received legal papers?
> A.   Right.

(William Dep. 11:12-12:2.)   Therefore, Roger's claim based on the unpaid severance will proceed to trial.

Accordingly, Roger's Retaliation Claim with respect to restricted access to the basement storage area is DISMISSED WITH PREJUDICE.

## VI.  Breach of Contract

Roger's claim for breach of contract also rests on Defendants' failure to pay him the second severance installment. Defendants maintain that Roger cannot recover for breach of contract because there was no contract supported by consideration, and even if there was, he breached the contract by taking the stove and refrigerator from the apartment when he left.  (Defs.' Roger Br. at 20-21.)  Roger argues that the parties had a written contract--his termination notice [14] -- and that his "past consideration" for the contract was sufficient under New York General Obligations Law § 5-1105.  (Roger's Opp. at 19-20.)

Under New York law, a contract must be supported by consideration.  Greenberg v. Greenberg, 646 F. App'x 31, 32 (2d

---

[14] The termination notice provides:

> In consideration of your many years of service, we will provide you with a severance of (1) month's salary and continue the same arrangement for your health insurance until 5/31/14.  We will provide you with half of your severance payment on 5/2/14 and the other half will be given to you upon vacating your apartment at Greenbrier Garden Apartments on June 17, 2014.  We ask that you communicate your departure date with Barbara Leeb, our Property Manager.

(Termination Letter, Myers Decl. Ex. 8, Docket Entry 79-8.)

Cir. 2016) (quoting Startech, Inc. v. VSA Arts, 126 F. Supp. 2d 234, 236 (S.D.N.Y. 2000)). "'Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor.'" Id. (quoting Startech, Inc., 126 F. Supp 2d at 237).

Here, Roger argues that Defendants' termination letter is a "written contract signed by Defendants, that [Roger] agreed to, which entitled him to severance pay." (Roger's Opp. at 19.) Specifically, he contends that Defendants agreed to pay him severance "[i]n consideration of [Roger's] many years of service."[15] (Roger's Opp. at 19-20 (citation omitted).)

"'Generally, past consideration is no consideration and cannot support an agreement because the detriment did not induce the promise.'" Greenberg, 646 F. App'x at 32 (quoting Samet v. Binson, 122 A.D.3d 710, 996 N.Y.S.2d 149, 150 (App. Div. 2d Dep't 2014)). However, past consideration may act as consideration under a statutory exception to the general rule. New York's General Obligations Law Section 5-1105 provides:

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is

---

[15] While Roger did not argue the point, the Court notes that there is no evidence that Roger was entitled to remain in the apartment beyond June 17, 2014 such that his "agreement" to vacate on that date served as consideration. (See Defs.' Roger Br. at 20-21; Defs.' Roger Reply at 9-10.)

> expressed in the writing and is proved to have
> been given or performed and would be a valid
> consideration but for the time when it was
> given or performed.

N.Y. Gen. Oblig. Law § 5-1105.

For the consideration to be "expressed" within the meaning of the statute, "the recitation of consideration must not be vague or imprecise." Genger v. Genger, 76 F. Supp. 3d 488, 498 (S.D.N.Y. 2015) (footnote omitted), aff'd, 663 F. App'x 44 (2d Cir. 2016). "[C]ourts have held that the statements 'past work on the Company's behalf' and 'services rendered on the respondent's behalf' are too vague and imprecise to meet [Section 5-1105's] expression requirement." Genger, 76 F. Supp. 3d at 498 (citing United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008); Umscheid v. Simnacher, 106 A.D.2d 380, 380, 482 N.Y.S.2d 295, 297 (App. Div. 2d Dep't 1984)). By contrast, "a promise to pay all of a company's debts on an ongoing basis," id. at 498-99 (citing Movado Grp., Inc. v. Presberg, 259 A.D.2d 371, 371, 687 N.Y.S.2d 116, 116-17 (App. Div. 1st Dep't 1999)), and an agreement stating that parties "are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for [their] benefit," id. at 499 (alterations in original), have been found to be "sufficiently precise and

unambiguous so as to satisfy § 1105's expression requirement." _Id._

The language in the termination letter here, "[i]n consideration of your many years of service," is an inadequate expression of consideration under Section 5-1105. It is virtually identical to language that other courts have found to be "vague, imprecise," and requires "resort to evidence extrinsic to the documents . . . to give meaning to the consideration 'expressed' in those documents." _Umscheid_, 106 A.D.2d at 381, 482 N.Y.S.2d at 297-98 (citing _Persico Oil Co. v. Levy_, 64 Misc. 2d 1091, 1092, 316 N.Y.S.2d 924, 925 (Sup. Ct. Albany Cty. 1970)) (holding that "[t]he consideration alluded to in the documents, _viz._, services rendered on the respondent's behalf," was inadequate); _see Greenberg_, 646 F. App'x at 31-32 (finding inadequate expression of consideration where document provided that "[t]his is a gift that is being given because of a through [_sic_] the years I Marshall Greenberg have given many gifts and many loans to Derrick Greenberg."); _United Res. Recovery Corp._, 584 F. Supp. 2d at 655-56 (finding statement "in consideration of past work on the Company's behalf" to be inadequate expression of consideration under statute).  Thus, it cannot serve as consideration for Defendants and Roger's purported severance agreement; the termination letter was not an "agreement" for Defendants to pay Roger severance, but rather, an unenforceable gratuitous promise.

*Shain v. Ctr. for Jewish History, Inc.*, No. 04-CV-1762, 2006 WL
3549318, at *5 (S.D.N.Y. Dec. 7, 2006) (holding that promise of
severance pay without mention of executing a release in
consideration of the severance was "nothing more than a gratuitous"
promise).

Accordingly, Roger's breach of contract claim is
DISMISSED WITH PREJUDICE.

CONCLUSION

For the foregoing reasons, Defendants' motion for
summary judgment against Dorothy Figurowski (Docket Entry 54) is
GRANTED IN PART and DENIED IN PART. Dorothy's overtime claims
under the FLSA and the NYLL and her minimum wage claim under the
FLSA are DISMISSED WITH PREJUDICE. The Court declines to exercise
supplemental jurisdiction over her remaining state law claims, and
they are DISMISSED WITHOUT PREJUDICE to refiling in state court.
The Clerk of the Court is directed to TERMINATE Dorothy Figurowski
as a Plaintiff in this matter and to enter judgment accordingly.

Defendants and Lieb's motion for summary judgment
against Roger Figurowski is GRANTED IN PART and DENIED IN PART.
Specifically, the motion is DENIED with respect to Roger's claim
for retaliation under the ADEA and the NYSHRL for Defendants'
refusal to pay him severance, and GRANTED in all other respects.
Accordingly, his claims for age discrimination under the ADEA and
the NYSHRL, retaliation under the ADEA and NYSHRL relating to his

restricted access to the basement storage room, aiding and abetting by Lieb in violation of the NYSHRL, and breach of contract are DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to TERMINATE Barbara Lieb as a Defendant in this matter.

The parties shall file letters within fourteen (14) days of the date of this Memorandum and Order setting forth their respective positions on scheduling a settlement conference with Judge A. Kathleen Tomlinson. Additionally, the parties are directed to file a revised proposed joint pretrial order within thirty (30) days of the date of this Memorandum and Order and are further directed to appear for a pre-trial conference with Judge Tomlinson on May 14, 2018 at 11:30 a.m.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     March ___30___, 2018
           Central Islip, New York